# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIANE MILLER,                                )
                                             )
       Plaintiff,                    )
                                             )
    v.                                      )     Civil Action No. 06-224
                                             )
JOHN K. WEINSTEIN, Treasurer,                )
County of Allegheny, and ALLEGHENY           )
COUNTY,                                      )
                                             )
       Defendants.                   )

## MEMORANDUM OPINION

CONTI, District Judge

### *Introduction*

Pending before the court is a motion for summary judgment filed by defendants John K. Weinstein ("Weinstein") and Allegheny County, Pennsylvania ("Allegheny County," together with Weinstein, "defendants"). (Doc. No. 53.) A magistrate judge filed a report and recommendation advising the court to grant this motion for summary judgment, as well as a supplemental report and recommendation advising the court that the initial recommendation has not changed since the filing of the objections of Diane Miller ("Miller" or "plaintiff"). For the reasons that follow, summary judgment will be granted in favor of Weinstein and Allegheny County.

## *Background*[1]

Plaintiff is a fifty-seven-year-old female who suffers from cerebral palsy, which is a chronic medical condition that impairs her ability to ambulate and speak. (Doc. No. 76 ¶¶ 1-2.) She has suffered from this condition since her childhood, and it has continued to worsen over time. (*Id.* ¶ 2.) She has used a walker in order to get around since undergoing back surgery a few years ago. (*Id.*)

Miller began working as a clerk for the Allegheny County Department of Personal Property in September 1970, shortly after graduating from high school. (*Id.* ¶ 3.) She worked as a general office clerk for the first twenty-five years of her employment. (*Id.* ¶ 4.) In 1996, Miller was transferred to the Allegheny County Treasurer's Office, where she also worked as a general office clerk. (*Id.*) Prior to the spring of 2005, she had never been formally disciplined by her employer. (*Id.* ¶ 7.)

The Treasurer's Office and the Personal Property Department merged in 1986. (*Id.* ¶ 8.) At that time, Jay Costa, Sr. ("Costa"), was the Allegheny County Treasurer. (*Id.*) Rose Brown ("Brown") served as Costa's secretary. (*Id.*) After the merger, Miller regularly purchased tickets to events to raise funds for Costa's campaigns. (*Id.* ¶ 10.) She completed these purchases by giving cash to Brown. (*Id.*) A few years later, Mary Alice McDonough ("McDonough") replaced Costa as the Allegheny County Treasurer. (*Id.* ¶ 11.) Brown initially served as McDonough's secretary. (*Id.*) Paula Guerra ("Guerra") eventually replaced Brown. (*Id.*) Miller

---

[1]This part contains a brief, general description of the factual and procedural background. Facts relevant to specific claims will be set forth in the discussions pertaining to those claims.

purchased tickets to McDonough's fundraising events as well. (*Id.* ¶ 14.) On those occasions, she gave Guerra cash in exchange for the tickets. (*Id.*)

In 1999, Weinstein was elected Treasurer of Allegheny County. (*Id.* ¶ 16.) His campaign manager was Allegheny County Sheriff Peter R. DeFazio ("DeFazio"). (*Id.*) DeFazio was subsequently convicted of illegally coercing Sheriff's Department employees to contribute to his political campaigns. (*Id.*) On February 23, 2007, this court sentenced DeFazio to probation for a period of five years, to home detention for a period of six months, and a $5,000.00 fine. (*United States v. DeFazio,* No. 06-cr-405, (W.D. Pa.) (Doc. No. 15).)

Miller purchased tickets to some of Weinstein's fundraisers. (Doc. No. 76 ¶ 25.) Specifically, she made a $50.00 payment in 2003 for a fundraiser. (*Id.*) Other Treasurer's Office employees made contributions to Weinstein's campaigns. (*Id.* ¶ 29.) On August 5, 2004, the Friends of John Weinstein Campaign Committee held a fundraiser at the Heinz Regional History Center in Pittsburgh, Pennsylvania. (*Id.* ¶ 35.) Pennsylvania Governor Edward G. Rendell was an honored guest at this event. (*Id.*) Tickets for the event were priced at $250.00 each. (*Id.* ¶ 36.) Miller contends that she did not attend the event because she could not afford to buy a ticket. (*Id.* ¶ 37.) Weinstein disputes the assertion that she did not attend the event. He claims that Miller actually attended the Rendell event because he had given her a complimentary ticket. (*Id.*) Weinstein's Campaign Finance Report for 2004, which was submitted in January 2005, does not list any contributions made by Miller. (*Id.* ¶ 38.)

The period of time immediately preceding the end of March is the busiest time of the year at the Treasurer's Office. (Doc. No. 62 ¶ 1.) March 31 is the last day on which taxpayers can receive a discount for the early payment of their property taxes. (*Id.*) The Treasurer's Office

prohibits its employees from taking vacation days during this period of time. (*Id.* ¶ 2.) On

February 18, 2005, Weinstein sent a memorandum to all Treasurer's Office employees

concerning vacation time. The memorandum stated as follows:

> As we are about to enter the 2005 tax season, it seems that our office will once again be inundated with high volumes of problems, confusion, and taxpayers questions, etc.
>
> In anticipation of another record-breaking season, and in conjunction with past practices and policy, NO VACATION request will be approved during the period of FEBRUARY 22, 2005 THRU APRIL 30, 2005. Supervisors are not authorized to approve days during this time period.
>
> It is crucial to the efficiency of the Treasurer's Office that this vacation policy is strictly adhered to; and there will be Absolutely NO Exceptions.
>
> Please be aware that this office will continue to monitor the sick day policy. It will not be acceptable to use sick time as a way of circumventing policy for vacation days off.
>
> During this tax season it is important that all employees start working at 8:30 sharp, and end the work day at 4:30.
>
> Thank you for your cooperation.

(Pl.'s Ex. 17 at 4.)

Good Friday fell on March 25, 2005. (Doc. No. 62 ¶ 3.) Good Friday is celebrated by

Christians as the day on which Jesus Christ was crucified. Six Treasurer's Office employees,

including Miller, did not work on that day. (*Id.*) Miller also missed work on Monday, March 28,

2005, and Tuesday, March 29, 2005. (Doc. No. 76 ¶ 54.) Guerra marked Miller's Good Friday

absence as a "personal day" and her absences on the other two days as "sick days." (*Id.* ¶ 55.)

Upon her return to work on Wednesday, March 30, 2005, Miller was asked to provide a medical

excuse for her sick days. (*Id.* ¶ 56.) She provided a handwritten note from Dr. William Lamb,

4

Jr., indicating that she had received an antibiotic for a sore throat and a sinus infection on March 28, 2005. (Pl.'s Ex. 1 at 5.) Karl Smith ("Smith"), who was the Office Manager, informed Miller that her absence on Good Friday had been unexcused, and that she would be docked a day's pay for not reporting to work. ( Doc. No. 76 ¶ 57.) A memorandum from Smith to Miller dated March 28, 2005, stated as follows:

> By failing to report to work on Friday, March 25th, 2005, you are in violation of the Treasurer's Office vacation policy, as outlined in a memo to all employees dated February 18, 2005. As a result of this violation, you will not be paid for the day.
>
> Be advised that any further unexcused absences during this critical time or in violation of office policy may result in additional disciplinary action.

(Pl.'s Ex. 22 at 42.)[2] After receiving the memorandum, Miller asked Smith for permission to meet with Weinstein. (Doc. No. 76 ¶ 85.) Although Weinstein was made aware of Miller's desire for a meeting, he did not meet with her. (*Id.* ¶ 88.)

On April 1, 2005, Miller filed an official grievance concerning the Treasurer's Office's decision to dock her a day's pay for missing work on Good Friday. (*Id.* ¶ 89.) On the grievance form, she indicated that she had sought permission on January 4, 2005, to take Good Friday off as a "personal day," and that nobody had told her that she could not miss work on that day. (Pl.'s Ex. 57 at 4.) Miller apparently made another unsuccessful attempt to have a meeting with Weinstein. (Doc. No. 76 ¶ 91.) On April 5, 2005, Miller emailed the following message to Weinstein:

---

[2]The record contains an identical memorandum from Smith to Miller dated April 1, 2005. (Pl.'s Ex. 56 at 2.)

DEAR JOHN,

I UNDERSTAND THAT I AM BEING DOCKED FOR GOOD FRIDAY. FIRST OF ALL IN OUR UNION CONTRACT, WHENEVER THEY TOOK GOOD FRIDAY AWAY FROM ALL OF US. THEY DID WRITE IN THE CONTRACT, THAT ANYONE WHO STILL WANTED TO HAVE GOOD FRIDAY OFF. WOULD HAVE TO USE A PERSONAL DAY. IN THE MEMO THAT YOU SENT AROUND, YOU DID SAY NO VACATION DAYS OR SICK DAY'S WOULD BE HONORED. BUT YOU DID NOT SAY ANYTHING ABOUT OUR PERSONAL DAY, AND I HAVE ALWAYS TAKEN A PERSONAL DAY EVERY YEAR ON GOOD FRIDAY. SINCE WE NO LONGER HAVE THAT DAY OFF. THERE HAVE BEEN SEVERAL PEOPLE OFF FOR VARIOUS REASON'S EVERY SINGLE WEEK SINCE JANUARY. WOULD YOU LIKE MY PASTOR'S TELEPHONE NUMBER? TO CALL HIM UP. GUESS WHAT JOHN TWO OF MY COUSIN'S ARE NOW ENGAGED TO BE MARRIED TO TWO DIFFERENT NEWS REPORTERS. PLUS JIM'S DAUGHTER ALSO WORKS FOR THE BUTLER NEWSPAPER, AND KNOWS A LOT OF NEWS PEOPLE FROM PITTSBURGH NOW. IT WOULD REALLY BE SOMETHING KNOWING 34 YEARS OF STUFF THAT I NOW KNOW. HAVING DIFFERENT NEWS PEOPLE MADE AWARE OF HOW SOME CERTAIN PEOPLE ARE TREATED, AND NOT OTHERS. SO HERE'S THE DEAL JOHN, GIVE ME BACK MY DAY WITH PAY AND I PROMISE TO KEEP MY MOUTH SHUT. BRING ME UP TO WHERE I SHOULD BE FOR 34 YEARS OF SERVICE. SINCE I NEVER EVER ABUSE MY TIME. AND I WILL START GIVING MONEY YEARLY TO YOU WEATHER IT'S A CAMPAIGN YEAR OR NOT. OH ONE LAST THING JOHN, TWO WEEKS AGO THEY CLOSED BOB'S OFFICE TO PAINT IT. AND I ASKED PAULA AND CHRISTIN TO ASK YOU IF I COULD PLEASE USE THEIR LADIES ROOM. JUST FOR TWO DAY'S. SINCE IN THE PAST I DID USE IT, AND I ALSO RECEIVED NO RESPONSE:

THANK YOU FOR YOUR TIME!
DIANE MILLER

( Pl.'s Ex. 60 at 14 (capitalization in original; underlining added).)

Because of her disability, Miller was permitted to leave work ten minutes early on most occasions. (Doc. No. 76 ¶ 119.) This accommodation was made so that she could avoid hazards resulting from the way in which other employees typically rushed out of the building at the end

of the workday.  (*Id.*)  On Wednesday, April 6, 2005, Smith observed Miller leaving early.  (*Id.* ¶

121.)  The next day, Smith presented Miller with a written reprimand which stated as follows:

> Narrative: On Wednesday, April 6, 2005 at 4:07 p.m. I observed Diane Miller at the elevator with her coat.
>
> Later I checked Diane's work station to see if she had returned.
>
> At 4:25 p.m. her supervisor acknowledged that she had not returned and had not ask permission to leave early.
>
> She had signed 4:30 on the sign out sheet.
>
> The Treasurer's Office hours are 8:30 a.m. to 4:30 p.m.
>
> It is important that all employees start working at 8:30 sharp and end the work day at 4:30.
>
> Be advised that any further unexcused absences are in violation of office policy and may result in additional disciplinary action.

(Pl.'s Ex. 61 at 16.)  Shortly thereafter, Miller was disciplined for using profanity in the presence

of her coworkers.  (Doc. No. 76 ¶ 127.)

Miller's email of April 5, 2005, was referred to Cheryl L. Cindrich ("Cindrich"), who was

the Treasurer's Office solicitor.  On April 13, 2005, Cindrich authored the following

memorandum to Miller:

> On April 5, 2005, Treasurer Weinstein received a highly inappropriate e-mail correspondence from you that may be in violation of 18 Pa. C.S.A. § 4701, Bribery in official and political matters.  A copy of the letter is attached.  The Treasurer absolutely and categorically rejects any demands whatsoever made by you in the letter.  Obviously under no circumstances would the Treasurer accept any proposals contained therein and he simply cannot be placed in the position that his actions could be construed as accepting a bribe or succumbing to extortion.  Therefore, as a result of your actions, the Treasurer will have no alternative but to terminate you for cause.

(Pl.'s Ex. 75 at 22.)  Miller's union representative was Mia Guinta ("Guinta").  Miller and Guinta met with Cindrich and Deputy Treasurer Thomas Bradley ("Bradley") on April 14, 2005.  (Doc. No. 62 ¶ 11.)  Miller was offered a chance to resign, thereby ensuring that she could collect her pension without incurring a penalty.  (*Id.*)  Weinstein was apparently willing to refrain from reporting Miller's actions to the authorities if she agreed to resign.  After refusing to resign, Miller was immediately suspended.  She was terminated on April 25, 2005.  (Doc. No. 82 at 5.)

The Allegheny County District Attorney's Office, in consultation with the Treasurer's Office, charged Miller with violating Pennsylvania's Public Official and Employee Ethics Act ("Ethics Act"), 65 PA. CONS. STAT. § § 1101 *et seq.*, rather than with committing the offense of bribery.  (Doc. No. 55 at 23 n.12.)

On February 21, 2006, Miller commenced this action against both Weinstein and Allegheny County, alleging that they violated her rights under the Free Exercise, Free Speech and Petition Clauses of the First Amendment, which are applicable to state actors by virtue of the Due Process Clause of the Fourteenth Amendment.  (Compl. ¶ 1.)  On March 7, 2006, this case was referred to a magistrate judge in accordance with 28 U.S.C. § 636(b)(1).  (Doc. No. 5.)

As proceedings in this action continued before the magistrate judge, the Commonwealth of Pennsylvania continued to pursue criminal charges against Miller.  Charges were pursued on the basis of both Miller's email to Weinstein and comments that she allegedly made to Bradley during the April 14, 2005 meeting.  The charge related to the email was dismissed before trial. (Pl.'s Ex. 80 at 19 ¶¶ 3-4.)  On November 28, 2006, Miller was tried in the Pennsylvania Court of Common Pleas of Allegheny County for violating the Ethics Act by making her comments to Bradley.  (Pl.'s Ex. 14 at 2.)  The trial was conducted without a jury.  (*Id.*)  Bradley, who testified

at the trial, described the alleged comments by Miller that formed the basis for the prosecution

under the Ethics Act. Explaining the purpose and content of the meeting held on April 14, 2005,

Bradley testified as follows:

> A. The point of it was then to address the seriousness of the e-mail and to inform Ms. Miller that she was going to be indefinitely suspended and that the e-mail was going to be forwarded to the District Attorney's Office for final determination as to what should happen with it, with the situation.

> Q. And was she, in fact, informed of that?

> A. Yes, absolutely.

> Q. What happened subsequent to you informing her that the matter was going to be referred to the District Attorney's Office?

> A. Well, after that conversation, the union rep and our solicitor left the room to discuss options, and at that time Diane said she was very upset. She said to me, "I didn't mean for this to happen. If I could just get what I have coming to me, I will give John $400 every year."

> Q. Did you respond to that?

> A. Yes, I did. I said, Diane, that's why we're here. You shouldn't be saying things like that. You can't make those kind of offers. And she repeated it. She said it again. "I didn't mean for this to happen. Just give me what I have coming. I will give him $400 every year." At that time the solicitor came back in the office and the meeting broke up.

> Q. Did you inform them what had just taken place?

> A. Yes, I did. Well, I informed our solicitor.

> Q. And what happened with the remainder of the meeting?

> A. At that point Diane left the office. That was the end of the meeting.

> Q. Had she been suspended at that point?

> A. She was informed at that meeting at that point she was being suspended, yes.

> Q.     Subsequently, she did not report to the office?
>
> A.     Correct.  As far as I know, yes.
>
> Q.     Okay.  Now, are you aware then the case was referred to the District Attorney's Office?
>
> A.     Yes.

(Pl.'s Ex. 14 at 6-7.)

Although Miller described this conversation in a slightly different manner, her trial testimony was somewhat consistent with Bradley's contention that Miller had mentioned something about contributing to Weinstein's campaigns.  She explained that, after her absence on March 25, 2005, Smith had repeatedly harassed her.  (Pl.'s Ex. 14 at 1.)  This "harassment" allegedly caused Miller to believe that Weinstein was retaliating against her for failing to buy a $250.00 ticket to the August 5, 2004 fundraising event with Governor Rendell.  (*Id.*)  With respect to her conversation with Bradley on April 14, 2005, Miller testified as follows:

> Q.     Okay.  What was said between you and he in regard to your e-mail?
>
> A.     Cheryl Cindrich and Mia Giunta left the room and I was really upset, and I said, "What did John want from me?  Did he want me to buy two tickets?  Four tickets?"  And Tom never answered.  He just sat there, and then they came back into the room, and then I was told to leave, told me I was complaining.
>
> Q.     Mr. Bradley was at the meetings.  He's the Deputy Treasurer and he testified to that.  But do you understand him to hold another position with the campaign committee of Mr. Weinstein?
>
> A.     Pardon me?
>
> Q.     Do you understand Mr. Bradley to be the Treasurer of the campaign committee?
>
> A.     Yes.

[An objection to the question was overruled by the court].

Q.      What do you understand Mr. Bradley's position to be with Mr.
        Weinstein's campaign?

A.      I think that he had influence on saying through the paper as to who gave to
        the campaign and who did not give.

Q.      And your testimony is you asked him what John wanted?

A.      Yes, I did.  I did not know at that point what he wanted from me, whether I
        had to buy two tickets, four tickets to keep my position and it would not
        affect my job–I was willing to do whatever it took to keep my position.

Q.      What made you think John wanted anything?

A.      I just had a gut feeling at that point.

Q.      Based upon the way--

A.      Just by the way I was being harassed by Carl Smith.

Q.      And your statement in the e-mail, what was the–what did you--

A.      My intent in the e-mail was to ask John to allow the harassment to stop.  I
        just wanted to be treated fairly as an employee for 34 years.  I did not
        indicate anything more.

Q.      Did you attribute the treatment that you were receiving at
        work–specifically the disciplines–at all to your discontinuation of making
        contributions to Mr. Weinstein's campaign?

A.      Most definitely, yes.

(*Id.* at 3-5.)  The testimony of both Bradley and Miller made it clear that Miller had said

*something* to Bradley about contributing to Weinstein's campaign in order to keep her job, even

though it was not clear exactly *what* she had said.

Miller was acquitted.  (*Id.* at 42-43.)  Although the judge described her conduct as

reprehensible, he indicated that the Commonwealth had not proven a violation of the Ethics Act

11

beyond a reasonable doubt. (*Id.*) The judge made it clear that he would have found in favor of the Commonwealth if the burden of proof had been the preponderance of the evidence standard applicable in civil cases. (*Id.* at 42.)

After the conclusion of the criminal proceedings, Miller continued to pursue this action against Weinstein and Allegheny County. On September 24, 2007, Weinstein filed a motion for summary judgment. (Doc. No. 53.) On April 15, 2008, the magistrate judge filed a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), recommending that Weinstein's motion for summary judgment be granted. (Doc. No. 77.) On May 1, 2008, Allegheny County moved for an amendment to the report and recommendation, seeking summary judgment in its own right, since all of the claims against it had been based upon conduct allegedly engaged in by Weinstein. (Doc. No. 78.) The next day, the magistrate judge amended the report and recommendation in a text order, making it clear that a grant of summary judgment in favor of Weinstein necessarily required a similar grant of summary judgment in favor of Allegheny County. In the report and recommendation, the magistrate judge referred to Miller's email of April 5, 2005, as an "extortion threat." (Doc. No. 77 at 11.)

After considering Miller's objections to the report and recommendation in accordance with 28 U.S.C. § 636(b)(1), on June 16, 2008, the court remanded this case to the magistrate judge with instructions to consider Miller's objections relating to the reference to the email as an "extortion threat." (Doc. No. 84.) On June 24, 2008, the magistrate judge filed a supplemental report and recommendation, explaining that the term "extortion threat" was used in a generic sense, and that the earlier recommendation had not been predicated on a determination that Miller had engaged in "extortion" as defined by the criminal law. (Doc. No. 85.) The magistrate

judge continued to recommend that summary judgment be granted in favor of Weinstein and Allegheny County. On July 11, 2008, Miller filed objections to the supplemental report and recommendation. (Doc. No. 86.) The magistrate judge's report and recommendation and supplemental report and recommendation, and Miller's objections thereto, are currently pending before the court and are the subject of this memorandum opinion.

### *Standards of Review*

The Federal Magistrate Judges Act, 28 U.S.C. §§ 631 *et seq.*, establishes the standard which governs this court's review of a report and recommendation filed by a magistrate judge. The relevant statutory language provides:

> Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1). Because the report and recommendation at issue concerns a motion for summary judgment, the court must proceed with the applicable summary judgment standard in mind. Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated only when there is a genuine issue

of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether a dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249.

## *Discussion*

In the initial report and recommendation, the magistrate judge rejected the argument by Miller that Weinstein's motion for summary judgment should be denied because of Weinstein's alleged failure to comply fully with Local Rule 56.1. (Doc. No. 77 at 6-7.) The magistrate judge recommended that summary judgment be granted in favor of Weinstein and Allegheny County with respect to all four of Miller's First Amendment claims. (*Id.* at 8-13.) Although Miller does not object to the recommendation concerning the application of Local Rule 56.1, she clearly objects to the recommendations concerning the merits of her First Amendment claims. (Doc. No. 82 at 7-20; Doc. No. 86 at 2-10.) Consequently, the court will examine the substantive issues surrounding her claims de novo.

Miller brings her claims against Weinstein and Allegheny pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. This statute does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129 n.11 (1980). A plaintiff cannot prevail in an action brought under section 1983 without establishing an underlying violation of federal law. *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992). "Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)(internal quotation marks omitted).

Miller asserts claims under the Free Exercise, Free Speech and Petition Clauses of the First Amendment. (Compl. ¶ 27.) The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I. First Amendment provisions are applicable to state actors by virtue of the Due Process Clause of the Fourteenth Amendment. *Locke v. Davey*, 540 U.S. 712, 718 (2004); *United Bhd. of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 831 (1983). Each of Miller's First Amendment claims will be addressed.

## A. The Free Exercise Clause Claim

Miller argues that Weinstein and Allegheny County violated her rights under the Free Exercise Clause by penalizing her for adhering to her religious beliefs. She is a member of Assembly of God Church, which is a Christian denomination. (Doc. No. 1 ¶ 9.) Christians observe Good Friday as the day on which Jesus Christ was crucified. Good Friday is the Friday immediately preceding Easter Sunday, which is celebrated by Christians as the day on which

Jesus Christ rose from the dead. Easter Sunday falls on the Sunday following the full moon that occurs on or following the spring equinox. "Easter on the Net,"

http://www.holidays.net/easter/eadates.htm (as visited on August 20, 2008). It can be as early as March 22 or as late as April 25. *Id.* Since Easter Sunday falls on different days each year, the same is true of Good Friday.

The evidence of record, which Miller does not appear to dispute, establishes that the period of time immediately preceding the end of March is the busiest time of the year at the Treasurer's Office. (Doc. No. 62 ¶ 1.) The volume of work during that time results from the last day of March also being the last day on which taxpayers in Allegheny County can receive a discount for the early payment of their property taxes. (*Id.*) The Treasurer's Office's need to have the maximum number of employees working during this period of time explains why Weinstein issued the memorandum of February 18, 2005, informing employees that requests for vacation time would not be approved between February 22, 2005, and April 30, 2005. (Pl.'s Ex. 17 at 4.)

In a deposition on April 17, 2007, Miller testified that Good Friday had been a paid holiday for employees of Allegheny County prior to 1978. (Miller Dep. 25, Apr. 17, 2007.) She explained that the policy was changed in 1978, when Allegheny County hired Jehovah's Witnesses who wanted to work on Good Friday. (*Id.*) She further testified that any employee who wanted to be off on Good Friday subsequent to the change was permitted to take it off as a "personal" day. (Miller Dep. 27.) Miller missed work on Good Friday every year throughout her 34-year history as an Allegheny County employee, and no one ever indicated to her that it was improper for her to do so. (*Id.*)

The record indicates that, during Weinstein's tenure as the Treasurer, employee absences on Good Friday had not seriously impaired the work of the Treasurer's Office prior to 2005 because Good Friday had usually fallen on a Friday in April. In his deposition, Bradley testified that the Treasurer's Office typically became less busy after March 31. (Bradley Dep. 36-37, July 5, 2007.) He explained that, since Weinstein's election in 1999, Good Friday had only fallen in March on two occasions. (*Id.*) The first such occasion had been in 2002, but the due date for taxes that year had been moved back to June. (*Id.*) Consequently, the Treasurer's Office's busiest period of time had not yet begun on March 29, 2002, which was Good Friday. Bradley testified that 2005 had been the first year in which Weinstein viewed absences on Good Friday as a disruption to the work of the Treasurer's Office. (*Id.*)

The court takes judicial notice that, between Weinstein's election as the Treasurer in 1999 and Miller's discharge in 2005, Good Friday fell on the following six dates: April 21, 2000; April 13, 2001; March 29, 2002; April 18, 2003; April 9, 2004; and March 25, 2005. Bradley's testimony concerning the late due date for taxes in 2002 is uncontradicted. Consequently, the record establishes that, during Weinstein's tenure, Good Friday would not have fallen within the Treasurer's Office's busiest period of time until 2005.

The court acknowledges Miller's apparent belief that the policy precluding employees from taking *vacation* days during the relevant period of time did not preclude them from taking *personal* days during that period. In addition, Miller testified that she had given her immediate supervisor, Joseph Gurcak ("Gurcak"), a slip in which she requested Good Friday off, and that Gurcak had assured her that everything would be "fine." (Miller Dep. 114.) In the official grievance form completed on April 1, 2005, Miller indicated that she had made her request on

January 4, 2005.  (Pl.'s Ex. 57 at 4.)  The court notes that this request, if made on that date,

preceded Weinstein's memorandum of February 18, 2005.  Weinstein and Allegheny County

dispute Miller's assertion that she had requested Good Friday off, but the court must view the

evidence in the light most favorable to Miller at this stage.  Hence, the court will consider that

Miller had, in fact, requested Good Friday off, and that she had been under the impression that

she did not have to report to work on that day.

The Free Exercise Clause embraces the general proposition that the government cannot

compel an individual to act contrary to his or her religious beliefs.  *Anspach v. City of

Philadelphia*, 503 F.3d 256, 272 (3d Cir. 2007).  This general proposition, however, warrants

further explanation.  The Free Exercise Clause categorically prohibits governmental regulation of

religious *beliefs*, but it does not categorically prohibit governmental regulation of religiously

motivated *conduct*.  *Blackhawk v. Pennsylvania*, 381 F.3d 202, 207 (3d Cir. 2004).  In order to

explain exactly what that means in the present context, the court turns to the relevant decisions of

the United States Supreme Court.

In *Sherbert v. Verner*, 374 U.S. 398, 399-410 (1963), the Supreme Court held that South

Carolina's unemployment compensation scheme, which precluded an applicant from receiving

benefits if he or she had refused to accept "suitable work," could not be constitutionally applied

to deny benefits to a Seventh-Day Adventist who had been discharged by her employer (and who

had been unable to find a job with a different employer) because of her refusal to work on

Saturdays, which was the Sabbath Day of her faith.  The Supreme Court pointed out that South

Carolina had provided workers with protection for refusing to work on Sundays, which resulted

in disparate treatment between those who celebrated their Sabbath on Saturday and those who

celebrated their Sabbath on Sunday. *Id.* at 406. ("Significantly South Carolina expressly saves the Sunday worshiper from having to make the kind of choice which we here hold infringes the Sabbatarian's religious liberty."). The finding of disparate treatment in *Sherbert*, however, was a compounding factor considered by the Supreme Court. *Id.* ("The unconstitutionality of the disqualification of the Sabbatarian is thus *compounded* by the religious discrimination which South Carolina's general statutory scheme necessarily effects.")(emphasis added). Whether the Free Exercise Clause may require a government to honor an employee's desire to avoid working on a religious holiday is an issue that is not foreign to constitutional jurisprudence.

The holding in *Sherbert* was limited by the Supreme Court's subsequent decision in *Employment Division v. Smith*, 494 U.S. 872, 874-90 (1990), which held that the State of Oregon could deny unemployment benefits to Native Americans who had been discharged for engaging in religiously inspired (and criminally proscribed) peyote use. Justice Scalia, who delivered the Supreme Court's opinion in *Smith*, explained that an individual's religious beliefs cannot excuse him or her from complying with an otherwise valid statutory provision prohibiting conduct that a state is free to proscribe. *Id.* at 878-79. The Native Americans' use of peyote was prohibited under a constitutionally permissible statute. The State of Oregon was permitted to deny their claims for unemployment benefits pursuant to a neutral policy precluding the provision of benefits to those who had been discharged because of misconduct. *Id.* at 890.

The issue in *Smith* primarily involved the level of scrutiny applicable to the Oregon statute at issue. The Constitution, of course, would not permit a government to burden an individual's free exercise of religion for no *rational* purpose. The level of scrutiny is heightened, however, where a law or policy specifically targets religious practices for disfavored treatment.

As the Supreme Court explained in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." A statute must be "justified by a compelling interest" and "narrowly tailored to advance that interest" in circumstances where the object of the statute is to "infringe upon or restrict practices *because* of their religious motivation." *Id.* at 533 (emphasis added). The level of scrutiny applied by a court entertaining a challenge under the Free Exercise Clause depends upon whether the law or policy at issue is a neutral rule of general applicability or a rule which specifically disfavors practices because of their religious motivation (either on its face or in actual application). *Combs v. Homer-Center Sch. Dist.*, U.S. App. LEXIS 17835, at **28-30 (3d Cir. Aug. 21, 2008).

In his deposition, Weinstein testified that he had been "irritated" to learn that some of his employees had decided to take Good Friday off in 2005. (Weinstein Dep. 74, July 11, 2007.) He explained that he had instructed Bradley to inform Guerra that employees who had taken Good Friday off without an excuse were to be docked a day's pay. (*Id.*) The order to dock the pay of absent employees did not apply to employees who had been excused. For instance, one individual was permitted to miss work on that day because of his wife's illness. (Weinstein Dep. 70.) Another individual did not report to work because she had to deal with an emergency medical issue. (Weinstein Dep. 72-74.) These employees were not reprimanded, or otherwise disciplined, for missing work on Good Friday. In the unemployment compensation context, the Supreme Court has embraced the general proposition that where a government "has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious

hardship' without compelling reason." *Smith*, 494 U.S. at 884 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)). It is not clear how (or whether) this rule would apply to the Treasurer's Office's attendance policy. The court need not reach that question in this case because Miller's Free Exercise Clause claims fail for other reasons.

Miller was not the only employee who did not report to work on March 25, 2005. It is undisputed that other employees were absent, and that at least five of those other employees had not been excused from working on that day. In an affidavit dated December 31, 2007, Smith declared that he had verbally reprimanded each Treasurer's Office employee who had missed work on March 25, 2005, without proper authorization. (Defs.' Ex. 11 at 4.) He also stated that each of these employees had been given a written reprimand. (*Id.*) Diana Maize ("Maize") and Teresa Valicenti ("Valicenti"), two Treasurer's Office employees who had not reported for work on March 25, 2005, filed affidavits stating that they had been reprimanded by Smith both verbally and in writing for their absences. (Defs.' Ex. 11 at 2-3.) Notwithstanding the affidavits submitted by Smith, Maize and Valicenti, Miller contends that she was singled out for discipline. (Doc. No. 82 at 4.) Specifically, she points out that there were no written reprimands in the personnel files of the other employees. (*Id.*) Viewing the evidence in the light most favorable to Miller, the court will assume that Miller is the only employee who received a written reprimand. The court will also assume *arguendo* that Weinstein knew that Miller wanted to have Good Friday off *because* she wanted to observe the day as a religious holiday.

Miller's Free Exercise Clause claim fails because she did not establish a direct causal relationship between her religious activities and Weinstein's decision to discharge her. Miller does not contend that she was *discharged* because of her absence on Good Friday. Indeed, she

received a written reprimand, and not a notice of discharge, as a result of the absence.  She

appears to acknowledge that she was discharged because of her email on April 5, 2005, which

took issue with the discipline imposed on her for that absence.  (Doc. No. 86 at 8.)  It was the

*email*, rather than the *absence*, which prompted Weinstein to terminate Miller.  Finally, it is

undisputed that Miller was *never docked* for missing work on Good Friday.  At her criminal trial,

Miller testified that she had ultimately been *paid* for that day.  (Pl.'s Ex. 14 at 39.)  Although

Weinstein ordered Bradley and Guerra to ensure that the absent employees were docked a day's

pay, he later acknowledged that those employees (including Miller) had never been docked.

(Weinstein Dep. 76.)  It is unclear *why* the absent employees were not docked a day's pay.

Bradley testified that Guerra may have simply forgotten to dock them.  (Bradley Dep. 50.)  In any

event, there is no indication in the record that Miller's *religious exercise* was substantially

burdened by any action taken by Weinstein.  *Anspach*, 503 F.3d at 272.

The court acknowledges Miller's argument that her email of April 5, 2005, was *itself*

activity protected under the First and Fourteenth Amendments.  That argument, however, relates

to her claims under the Free Speech and Petition Clauses; it does not relate to her claims under

the Free Exercise Clause.  Similarly, with respect to Miller's official grievance of April 1, 2005.

Miller does not contend that her *religious beliefs* required her to send the April 5, 2005 email to

Weinstein.  Miller's argument that she endured retaliation for engaging in *religious activities* is

belied by her own contention that Weinstein's *real reason* for disciplining and discharging her

was her failure to buy a ticket to the fundraiser held on August 5, 2004.  Miller testified that,

prior to 2005, while Weinstein was the Treasurer, she had always taken Good Friday off without

incident.  (Miller Dep. 27.)  No reasonable jury could conclude that, after permitting Miller to

miss work on Good Friday for five straight years, Weinstein suddenly started to discriminate

against Miller because of her *religious observance*.  Based upon this record, no reasonable jury

could render a verdict in favor of Miller with respect to her claims under the Free Exercise

Clause.  Summary judgment will be granted in favor of Weinstein and Allegheny County with

respect to Miller's claims under the Free Exercise Clause.

**B.  The Claims Concerning the Email of April 5, 2005**

**1.  <u>Free Speech Clause Claim</u>**

Miller contends that Weinstein violated her rights under the Free Speech Clause when he

terminated her.  The Supreme Court for decades adhered to the general proposition that the

Constitution did not impose limits on a public employer's ability to condition public employment

on a public employee's willingness to refrain from engaging in activities that otherwise received

constitutional protection.  *Adler v. Bd. of Educ.*, 342 U.S. 485, 492 (1952)("They may work for

the school system upon the reasonable terms laid down by the proper authorities of New York.  If

they do not choose to work on such terms, they are at liberty to retain their beliefs and

associations and go elsewhere.").  In more recent times, the Supreme Court has recognized that

"the First Amendment protects a public employee's right, *in certain circumstances*, to speak as a

citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417

(2006)(emphasis added).  The constitutionality of discipline imposed by a public employer on a

public employee is not necessarily examined in accordance with the standards applicable to

speech restrictions imposed by the government on members of the general population.  *City of*

*San Diego v. Roe*, 543 U.S. 77, 80 (2004)(observing that a governmental entity may

constitutionally impose restrictions on the speech of its employees "that would be

unconstitutional if applied to the general public").  The Supreme Court has noted that "[t]he

government's interest in achieving its goals as effectively and efficiently as possible is elevated

from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as

employer."  *Waters v. Churchill*, 511 U.S. 661, 675 (1994)(plurality opinion).

The framework employed by courts to test the constitutionality of employer discipline in

retaliation for speech has its genesis in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), which

was decided by the Supreme Court four decades ago.  In *Pickering*, speaking through Justice

Marshall, the Supreme Court explained:

> "The theory that public employment which may be denied altogether may be
> subjected to any conditions, regardless of how unreasonable, has been uniformly
> rejected."  *Keyishian v. Board of Regents*, [385 U.S. 589, 605-606 (1967)].  At the
> same time it cannot be gainsaid that the State has interests as an employer in
> regulating the speech of its employees that differ significantly from those it
> possesses in connection with regulation of the speech of the citizenry in general.
> The problem in any case is to arrive at a balance between the interests of the
> teacher, as a citizen, in commenting upon matters of public concern and the
> interest of the State, as an employer, in promoting the efficiency of the public
> services it performs through its employees.

*Pickering*, 391 U.S. at 568.  Given the language in *Pickering*, it is clear that a public employee's

right to be free from employer discipline in retaliation for speech protects only his or her interest

in speaking *as a citizen* about *matters of public concern*.  Where implicated, it is *this* interest

which must be weighed against the employer's interest in "promoting the efficiency of the public

services it performs through its employees."  *Id.*  Where a public employee does not speak *as a

citizen* about *matters of public concern*, there is nothing to balance against the competing

interests of the public employer.  *Roe*, 543 U.S. at 82 ("*Pickering* did not hold that any and all

statements by a public employee are entitled to balancing.  To require *Pickering* balancing in

every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the functioning of government offices.").

In this context, the question of constitutional protection is unique to the public employment setting. While a particular category of speech may not *entitle* a public employee to constitutional protection from employer discipline, that same category of speech may also enjoy constitutional protection in other contexts. In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court observed that "an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street." *Id.* at 147. Some forms of speech which enjoy constitutional protection from *sovereign governmental authority* do not enjoy constitutional protection from *public employer discipline*. Speech that is categorically unprotected by the First Amendment (i.e., defamation, fighting words, incitement, obscenity, child pornography depicting real children, false or misleading commercial speech, speech advertising unlawful activities, etc.) enjoys no constitutional protection from employer discipline even where it does involve a matter of public concern. *Jarman v. City of Northlake*, 950 F.Supp. 1375, 1379 n.6 (N.D.Ill. 1997). Consequently, a finding of generalized constitutional protection under the First Amendment is a prerequisite to a finding of the more narrow form of constitutional protection available to public employees under *Pickering*. Speech that is categorically unprotected by the First Amendment is *ipso facto* unprotected under *Pickering*.

A First Amendment retaliation case of this kind can be broken down into two general components. The first component deals with the issue of constitutional protection, while the second component deals with the issue of causation. In order to enjoy constitutional protection

from employer discipline, speech by a public employee must be made (1) in his or her capacity *as a citizen* (2) addressing a *matter of public concern* (3) under circumstances in which, on *balance*, his or her interest in speaking outweighs his or her employer's interest in workplace efficiency. *Pickering*, 391 U.S. at 568 ("The problem in any case is to arrive at a *balance* between the interests of the teacher, *as a citizen*, in commenting upon *matters of public concern* and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.")(emphasis added). In this case, it is undisputed that Miller spoke "as a citizen" when she sent her email of April 5, 2005. In other words, she was not speaking pursuant to her official duties. *Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The issue of constitutional protection in this case turns on whether Miller's email addressed a matter of public concern, and on whether her interest in speaking outweighed the Treasurer's Office's interest in preventing any disruptions caused by her speech. These are both questions of law for the court to decide. *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005).

If it is determined that a public employee's speech enjoys constitutional protection from employer discipline, the employee must establish causation between his or her speech and the relevant adverse action alleged to have been retaliatory. In *Mt. Healthy City School District v. Doyle*, 429 U.S. 274 (1977), the Supreme Court explained:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his

employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* at 286.  In order to establish causation, a public employee asserting a First Amendment retaliation claim against his or her employer must first establish that his or her constitutionally protected speech was a substantial or motivating factor behind the challenged retaliatory action. *Id.* at 287.  If the public employee makes such a showing, the burden shifts to the public employer to establish by a preponderance of the evidence that it would have taken the same action in the absence of the employee's constitutionally protected speech.  *Id.*  The issue of causation is a question of fact for the jury to decide.  *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001).

With respect to the email of April 5, 2005, causation is not in dispute.  Weinstein expressly relies upon that email as the basis for his decision to discharge Miller.  Miller's speech-based retaliation claims present complicated legal questions.  Although Miller was tried for her alleged comments to Bradley on April 14, 2005, the record reflects that Weinstein had decided to discharge Miller prior to that meeting.  Cindrich prepared a memorandum on April 13, 2005, informing Miller of her impending termination.  (Pl.'s Ex. 75 at 22.)  Thus, the "speech" at issue is the email of April 5, 2005.

The crux of Miller's argument is that her speech addressed a matter of public concern for purposes of *Pickering*.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.  As noted earlier, however, speech that is categorically unprotected under the First Amendment cannot suffice to support a public

employee's First Amendment retaliation claim *regardless* whether it addresses a matter of public concern. *Jarman*, 950 F.Supp. at 1379 n.6. Even where speech may enjoy constitutional protection in a more fundamental sense, it may still lack the more narrow constitutional protection from public employer discipline where it addresses "matters only of personal interest." *Connick*, 461 U.S. at 147. Miller argues that her "motivation" for sending the email to Weinstein was to alleviate harassment that she was enduring, which she perceived to be retaliation for her failure to buy a ticket to Weinstein's August 5, 2004 fundraiser. An employee's "motivation" for speaking "is 'merely one factor to be considered, but not necessarily controlling, in assessing the character of [the employee's] speech.'" *Zamboni v. Stamler*, 847 F.2d 73, 78 (3d Cir. 1988)(brackets in original)(quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir. 1988)).

In her email to Weinstein, Miller addressed several different matters. First, she complained about Weinstein's decision to dock her a day's pay for missing work on March 25, 2005. She referenced contacts that she had with members of the media, who could presumably publicize alleged improprieties within the Treasurer's Office. Having laid that groundwork, Miller proposed a "deal" whereby she would keep her "mouth shut" if Weinstein agreed not to dock her for missing work on Good Friday. Miller then stated that she would make annual contributions to Weinstein's campaigns (even in years in which he was not running for re-election) if he were willing to "bring [her] up to where [she] should be for 34 years of service." (Def.'s Ex. 2 at 7.) She concluded her email by requesting access to a specific restroom for a period of two days. .

The portions of the email discussing Weinstein's decision to dock Miller a day's pay for missing work on Good Friday clearly address a matter of only private concern to Miller.

*Connick*, 461 U.S. at 153 ("When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office."). The same is true of Miller's request for access to a restroom. While these statements enjoy constitutional protection from the *sovereign* actions of a government in relation to its citizens, they do not enjoy constitutional protection from the *employment* actions of a public employer in relation to its employees. Hence, they cannot form the basis of a First Amendment retaliation claim under *Pickering*.

Like most American jurisdictions, Pennsylvania criminalizes bribery. The relevant statutory provision, which was referenced in Cindrich's memorandum to Miller, provides:

> **§ 4701. Bribery in official and political matters**
> **(a) Offenses defined.–**A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:
>> (1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;
>> (2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or
>> (3) any benefit as consideration for a violation of a known legal duty as public servant or party official.
> **(b) Defenses prohibited.–**It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, had left office, or lacked jurisdiction, or for any other reason.

18 PA. CONS. STAT. § 4701. Weinstein and Cindrich apparently believed that Miller had committed the offense of bribery, as defined by 18 PA. CONS. STAT. § 4701, when she sent her email of April 5, 2005.

Employees of political subdivisions such as Allegheny County are subject to the provisions of Pennsylvania's Public Employee Pension Forfeiture Act ("Forfeiture Act"), 43 Pa. Stat. §§ 1311 *et seq.* The relevant provision of the Forfeiture Act provides:

**§ 1313.  Disqualification and forfeiture of benefits**
(a) Notwithstanding any other provision of law, no public official or public employee nor any beneficiary designated by such public official or public employee shall be entitled to receive any retirement or other benefit or payment of any kind except a return of the contribution paid into any pension fund without interest, if such public official or public employee is convicted or pleads guilty or no defense to any crime related to public office or public employment.

43 Pa. Stat. § 1313(a).  The Forfeiture Act enumerates the crimes which are related to public office or public employment for purposes of this statutory language, and bribery under section 4701 is listed as such a crime.  43 Pa. Stat. § 1312(8).  Thus, if Miller were to be convicted of bribery, she stood to lose the pension which she had earned during the course of her 34-year employment with Allegheny County.

Pennsylvania also has the Ethics Act which provides in relevant part:

**§ 1103.  Restricted activities**
**(a) Conflict of interest.–**No public official or public employee shall engage in conduct that constitutes a conflict of interest.
**(b) Seeking improper influence.–**No person shall offer or give to a public official, public employee or nominee or candidate for public office or a member of his immediate family or a business with which he is associated, anything of monetary value, including a gift, loan, political contribution, reward or promise of future employment based on the offeror's or donor's understanding that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.
**(c) Accepting improper influence.–**No public official, public employee or nominee or candidate for public office shall solicit or accept anything of monetary value, including a gift, loan, political contribution, reward or promise of future employment, based on any understanding of that public official, public employee or nominee that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.

***

## § 1109.  Penalties
**(a) Restricted activities violation.**—Any person who violates the provisions of section 1103(a), (b) and (c) (relating to restricted activities) commits a felony and shall, upon conviction, be sentenced to pay a fine of not more than $10,000 or to imprisonment for not more than five years, or both.

65 Pa. Cons. Stat. §§ 1103(a)-(c), 1109(a).  The Allegheny County District Attorney's Office, in consultation with the Treasurer's Office, apparently made the decision to charge Miller with violating the Ethics Act rather than with committing the offense of bribery, since a conviction under the Ethics Act would not have jeopardized her entitlement to pension benefits.  (Doc. No. 55 at 23 n.12.)

Miller's email cannot form the basis of Free Speech Clause claims under *Pickering*.  Miller unambiguously offered to make contributions to Weinstein's campaigns in exchange for favorable treatment.  This offer invites conduct that may be viewed as a criminal act under Pennsylvania law.  18 Pa. Cons. Stat. § 4701(a); 65 Pa. Cons. Stat. § 1103(b)-(c).  Even if the *offer* were not a criminal act, Weinstein's *acceptance* of it would certainly be a criminal act.  The court does not understand Miller to argue to the contrary.  Regardless whether the offer itself constituted a crime, that Weinstein's acceptance of it would have constituted a crime is dispositive in this case.  Earlier this year, in *United States v. Williams*, 128 S.Ct. 1830 (2008), the Supreme Court declared that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection."  *Id.* at 1841 (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)).  The Supreme Court acknowledged that "there remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of

31

illegality." *Id.* at 1842. Speech falling within the latter category enjoys some degree of constitutional protection. In this case, however, there can be no doubt that Miller's offer was sufficiently direct (and insufficiently abstract) to place her "speech" beyond the protections afforded by the Free Speech Clause. The "content, form, and context" of the statements at issue indicate that Miller sought to influence Weinstein's actions immediately, not at some indefinite time in the distant future. Miller's offer to contribute to Weinstein's campaign in exchange for favorable treatment constituted the very type of *quid pro quo* offer that is recognized as being beyond the scope of First Amendment protection. See *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 290-317 (2003)(Kennedy, J., concurring in the judgment in part and dissenting in part). The notion that Pennsylvania may constitutionally proscribe such conduct by declaring it to be criminal is not subject to serious dispute.

As noted earlier, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U.S. at 675 (plurality opinion). The government has broader authority to *discipline* or *discharge* its *employees* for speech than it has to *prosecute* its *citizens* for speech. Speech that can be criminalized is *ipso facto* unworthy of the more narrow protection provided to public employees under *Pickering*. *Rankin v. McPherson*, 483 U.S. 378, 386-87 (1987). While the parties dispute *why* Miller sent her email to Weinstein, there is no dispute as to *what* the email said. Since the statements sent to Weinstein by Miller on their face implicate the possibility of a criminal violation if acted upon by Weinstein, it follows *a fortiori* that those statements can serve as the basis for a public employee's discharge.

Some portions of Miller's email of April 5, 2005, enjoyed no constitutional protection at all, and the remaining portions of that email were not of the kind worthy of the more narrow constitutional protection afforded to the statements of public employees. Thus, the email cannot sustain Miller's claim under the Free Speech Clause. There is no need for the court to apply the balancing test established in *Pickering*. *Roe*, 543 U.S. at 82. No reasonable jury could render a verdict in favor of plaintiff on this claim. Weinstein and Allegheny County are entitled to summary judgment with respect to Miller's Free Speech Clause claim concerning the email.

## 2. **Petition Clause Claims**

Miller contends that Weinstein violated her rights under the Petition Clause when he discharged her. Although the Petition Clause is "cut from the same cloth" as the Free Speech Clause, it is "an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). The issues surrounding Miller's termination must be examined with the *particular* requirements of the Petition Clause in mind. The issue of causation with respect to these claims proceeds according to the framework established by the Supreme Court in *Doyle* regardless of the precise First Amendment context in which it arises. *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007).

There are several potential bases for Miller's Petition Clause claims. The most obvious basis is the email of April 5, 2005. With respect to that email, there is no dispute about causation, since Weinstein relies on it as his reason for discharging Miller. To the extent that Miller relies on the email itself, the dispositive question concerns whether the Petition Clause provided her with broader protection than did the Free Speech Clause.

There are additional bases for Miller's Petition Clause claims. For instance, Miller filed an official grievance on April 1, 2005, concerning Weinstein's decision to dock her a day's pay for missing work on Good Friday. (Pl.'s Ex. 57 at 4.) The record contains evidence that Miller had previously engaged in protected activity before filing the official grievance. For example, in 2004, she filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging that she had been denied promotions because of her cerebral palsy. (Doc. No. 65-3 at 2-4.) The filing of those charges constituted the exercise of rights protected under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.* Although these statutes contain their own anti-retaliation provisions, the Petition Clause provides additional protection to *government* employees who file charges of discrimination under those statutory provisions. The invocation of a formal mechanism to redress an employment-related grievance constitutes activity protected under the Petition Clause. *Foraker v. Chaffinch*, 501 F.3d 231, 236 (3d Cir. 2007). There is no question that Miller's invocation of her rights under the Treasurer's Office's grievance policy, the ADA and the PHRA constituted activity entitled to Petition Clause protection. With respect to those activities, the dispute concerns the issue of causation. The court will begin by addressing the legal status of Miller's email of April 5, 2005, which is relied upon by Weinstein as the basis for Miller's discharge, and then address the issue of causation with respect to Miller's other activities.

The court has already concluded that the portion of the email in which Miller offered to make contributions to Weinstein's campaigns in exchange for favorable treatment did not enjoy

protection under the Free Speech Clause, since "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 128 S.Ct. at 1841 (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973); *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498 (1949)). In *McDonald v. Smith*, 472 U.S. 479 (1985), the Supreme Court made it clear that unprotected speech does not become "protected" merely because it is contained within a petition. *McDonald* concerned letters which had been written to President Ronald Reagan immediately before and shortly after his assumption of the duties of the presidency. *Id.* at 480-81. The letters included defamatory statements about an attorney who was under consideration for an appointment to a United States Attorney position. *Id.* The attorney, who was not appointed to the position, commenced a libel action against the author of the letters. *Id.* The author of the letters argued that his statements about the attorney enjoyed protection under the Petition Clause, since they had been made in a letter to an elected official. *Id.* at 481-82. The Supreme Court rejected this argument, holding that those defamatory statements could not be properly characterized as "protected" merely because they appeared in a petition. The Supreme Court observed that there was "no sound basis for granting greater constitutional protection to statements made in a petition to the President than [to] other First Amendment expressions." *Id.* at 485. *McDonald* stands for the proposition that speech which is categorically unprotected by the First Amendment does not obtain protection when it is placed within a petition. Thus, the portion of Miller's email requesting favorable treatment in exchange for campaign contributions cannot form the basis of a claim under the Petition Clause.

In *San Filippo v. Bongiovanni*, 30 F.3d 424, 438-43 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit held that a public employer violates the Petition Clause when it discharges an employee in retaliation for filing a formal petition. Even if the "speech" appearing within the petition does not involve a "matter of public concern" for purposes of *Pickering*, retaliation by a public employer may violate the Petition Clause. *Id.* The court of appeals made a distinction between "speech" addressed to the public at large and a "petition" addressed solely to a governmental audience. *Id.* at 442. The court of appeals concluded that, within the context of a formal petition, the Petition Clause protects values additional to those protected by the Free Speech Clause. *Id.* at 439.

The court needs to consider whether, assuming the entirety of the April 5, 2005 email was not tainted by the request for favorable treatment in exchange for campaign contributions, Miller's April 5, 2005 email to Weinstein can be characterized as a "petition" within the meaning of the First Amendment. Weinstein is an elected public servant. A government employee, like any other citizen, has a constitutionally protected right to contact (or "petition") an elected official. *See Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006). In *Foraker v. Chaffinch*, 501 F.3d 231, 237 (3d Cir. 2007), the court of appeals acknowledged that one can informally as well as formally petition a public official. It was specifically noted in *Foraker*, however, that "[p]etitions made through informal channels may occasion a lesser degree of constitutional protection than their formal counterparts." *Id.* at 237. There is language in *Foraker* which suggests that a public employee does not engage in petitioning activity when he or she informally complains to his or her supervisor, who happens to be a public official to whom petitions are sometimes addressed. *Id.* ("Price and Warren complained internally; they did not petition a state

36

agency qua agency. They appealed to their employer, which also happened to be a state agency, through informal channels."). The court considers that Miller's email of April 5, 2005, addressed an appeal to her employer and cannot be properly characterized as a "petition" for purposes of the Petition Clause.

With respect to the other potential bases for a Petition Clause claim, the court notes that when Miller filed her official grievance with the Treasurer's Office and her prior charges of discrimination with the EEOC and the PHRC, she undoubtedly engaged in constitutionally protected activity. The only question is whether a reasonable trier of fact could infer that Weinstein was motivated by that activity when he made the decision to discharge Miller. Miller points out that she was the only employee who had filed a grievance concerning Weinstein's decision to dock the employees who had missed work on Good Friday, and that the grievance was filed just a few days before she sent the email that Weinstein relied upon as the basis for her discharge. While temporal proximity between protected conduct and an alleged act of retaliation is certainly a relevant factor for consideration, it is important to remember that it is *causation*, and not temporal proximity itself, that is at issue. *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).[3] The *core facts* surrounding Miller's discharge are not in dispute. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006). Miller was terminated shortly after sending Weinstein an email in which she asked for favorable treatment in exchange for campaign contributions and offered to keep quiet about certain conduct if she received favorable treatment.

---

[3] Although decisions interpreting anti-discrimination statutes employ slightly different burden-shifting mechanisms than decisions interpreting the First Amendment, the general principles derived from those decisions are often instructive with respect to how causation should be analyzed in the First Amendment context. *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)("A political discrimination case employs similar, though not identical, burden-shifting mechanisms as those used in other employment discrimination contexts, such as Title VII cases.").

Regardless what Miller's subjective motivations may have been for *proposing* such a deal, it is axiomatic that Weinstein would have been guilty of a criminal offense had he opted to *accept* the proposal. Under these circumstances, no reasonable jury could infer that Weinstein discharged Miller in retaliation for her official grievance rather than in response to her email eliciting illegal conduct by Weinstein.

The court acknowledges Miller's argument that a discharge decision can be motivated by both permissible and impermissible factors alike. In this case, however, the record does not contain evidence suggesting that either Miller's filing of the official grievance, or her filing of charges of discrimination with the EEOC and the PHRC, was a substantial or motivating factor in Weinstein's decision to discharge her. Pure speculation is simply not evidence of a discriminatory or retaliatory animus. *Hicks v. Tech Indus.*, 512 F.Supp.2d 338, 348 (W.D.Pa. 2007). Miller relies on language in *San Filippo* in which the court of appeals explained that where a public employee has been dismissed after engaging in several different protected activities, a trier of fact may reasonably infer that the employer's termination decision was motivated by a desire to retaliate against the employee for the aggregate of such protected activities. *San Filippo*, 30 F.3d at 444. It is true that a reasonable jury could draw an inference of this kind in the absence of Miller's intervening email. *Id.* It is also true that that kind of inference could be drawn if employees who had engaged in comparable conduct had gone unpunished. *Id.* It cannot be gainsaid that the contents of Miller's email to Weinstein offered Weinstein an opportunity to engage in criminal activity, and there is no evidence that other employees of the Treasurer's Office had engaged in comparable conduct. Although Weinstein acknowledged that one of his prior employees may have used illegal drugs in the Treasurer's

Office, he testified that the employee had voluntarily resigned. (Weinstein Dep. 124-36.)

Weinstein stated that he had no clear evidence of illegal drug use within the Treasurer's Office

during the period of time in question. (*Id.*) Miller points to no evidence which contradicts

Weinstein's testimony. It is undisputed that Miller was given an opportunity to resign prior to

her termination. There is simply no evidence which could enable a reasonable trier of fact to

conclude that Miller's prior filings with the Treasurer's Office, the EEOC and the PHRC were

substantial or motivating factors behind Weinstein's decision to discharge Miller after her email

implicating Weinstein in illegal activity. Accordingly, Weinstein and Allegheny County are

entitled to summary judgment with respect to Miller's Petition Clause claims.

## C. The Political Patronage Discrimination Claims

Miller also asserts distinct First Amendment claims based upon political affiliation. The

First and Fourteenth Amendments prohibit a public employer such as the Treasurer's Office from

discriminating against a nonpolicymaking employee on the basis of his or her political affiliation.

The Supreme Court first held that it was unconstitutional for a public employer to dismiss an

employee on the basis of political affiliation in *Elrod v. Burns*, 427 U.S. 347, 372-73

(1976)(plurality opinion). The rule established in *Elrod* was refined in *Branti v. Finkel*, 445 U.S.

507 (1980), in which the Supreme Court held that political affiliation could serve as the basis for

a public employee's dismissal only upon a showing that party affiliation was "an appropriate

requirement for the effective performance of the public office involved." *Id.* at 518. This rule

was extended to hiring, promotion, transfer and recall decisions in *Rutan v. Republican Party of

Illinois*, 497 U.S. 62, 65 (1990), in which the Supreme Court held that a public employer could

not constitutionally discriminate on the basis of political affiliation when filling positions for

which party affiliation was not an appropriate requirement. A similar level of constitutional protection was extended to independent contractors in *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 673 (1996), and *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 714-15 (1996).

The United States Court of Appeals for the Third Circuit discussed the First Amendment's application to "political patronage discrimination" in *Galli v. New Jersey Meadowlands Commission*, 490 F.3d 265 (3d Cir. 2007). In *Galli*, the court of appeals recognized that "the First Amendment protects politically neutral or apolitical government employees from political patronage discrimination." *Id.* at 276. Consequently, a plaintiff need not show that he or she suffered discrimination for supporting a political opponent of his or her employer, or for directly opposing his or her employer with respect to a political matter. It is enough for a plaintiff to establish discrimination resulting from his or her political neutrality (i.e., his or her failure to purchase a ticket to a political fundraiser such as the one held by Weinstein on August 5, 2004). In order to prevail under this theory, Miller must establish that: (1) her position was not one for which political allegiance to Weinstein was an appropriate requirement; (2) she engaged in constitutionally protected conduct (i.e., she refrained from purchasing a $250.00 ticket to Weinstein's fundraiser); and (3) her constitutionally protected conduct was a substantial or motivating factor in Weinstein's decision to discharge her. *Galli*, 490 F.3d at 271. If Miller can make such a showing, Weinstein can "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997).

In her deposition, Miller recalled a conversation that she had engaged in with Brown in 1986, when Costa was the Treasurer. She testified as follows:

Q.      Tell me how you first made a political or campaign contribution in 1986, how did that come about?

A.      He was having a function and it was on note to everybody who went over to his office, and Jimmy Madden[4] had at that point retired.

Q.      Retired?

A.      Yes, he did. And then I remember one morning I asked his secretary--

Q.      Mr. Costa's secretary?

A.      Yes, I did. Rose Brown.

Q.      And what did you ask her about?

A.      I said, is it mandatory to buy tickets? What could happen if I don't? She said, nothing. She said, some morning you would come in and there would be no evidence you ever worked here. I said, in other words, you're telling me you'd phase my job out. She said, no honey, you said that. And from that point on, I just felt I had to give to keep my job.

Q.      So Rose Brown was Mr. Costa's secretary?

A.      At the time, yes, she was.

Q.      So I understand, you asked Rose Brown whether you should buy a ticket and what would happen if you didn't?

A.      Yes, I did.

Q.      And Rose Brown, what did she tell you would happened?

---

[4]The "Jimmy Madden" ("Madden") referred to in Miller's testimony was a chauffeur for County Commissioner Tom Forester. ( Miller Dep. 9-10.) Madden was a neighbor of Miller, and he assisted her in her efforts to get a job with Allegheny County shortly after she graduated from high school. (*Id.*) Miller, who graduated from high school in 1969, secured employment with Allegheny County in 1970. (*Id.*) She remained an employee of Allegheny County until her discharge in April 2005.

A.	She said nothing. Some morning you would come in, there would be no sign you ever worked here. And I said, in other words, you're telling me you would phase my job out? She said, no, honey, you said that. And I thought, okay. So from that time on, I felt compelled to give.

Q.	So would it be fair to say that in 1986 is when you first believed that if you didn't make a political contribution something might happen to your job?

A.	That's correct.

Q.	Now, can you tell me, other than Rose Brown, did any other employee or elected official at the county tell you what Rose Brown told you?

A.	No.

Q.	Ever?

A.	No.

Q.	So would it be fair to say that the last time you had a discussion with anyone in the county treasurer's office as to what might happen if you did or didn't purchase a ticket was 1986?

A.	That's correct.

Q.	And so that we're clear, you never had any discussion, then with Mary Alice McDonough or her staff about what would happen if you didn't purchase a ticket?

A.	No, I did not.

Q.	No, you did not have that discussion with anyone?

A.	Never.

Q.	Never, okay. And I'm going to ask the same for Mr. Weinstein during his tenure, did you have a discussion with anybody that worked for John Weinstein or his campaign about what would happen if you didn't purchase a campaign ticket?

A.	No, I did not.

Q. Okay. And so the only conversation you personally ever had one-on-one with anyone was the conversation you described with Rose Brown?

A. That's correct.

(Miller Dep. 14-17.) Miller's testimony with respect to this issue is clear. Her *perception* that she was obligated to contribute to Weinstein's campaigns (or to buy a $250.00 ticket to the fundraiser on August 5, 2004) stemmed from a conversation that she remembered from 1986. Eighteen years passed between Miller's alleged conversation with Brown and the fundraiser at the Heinz Regional History Center. Within that period of time, Guerra replaced Brown as the Treasurer's secretary, McDonough succeeded Costa as the Treasurer, and Weinstein succeeded McDonough as the Treasurer. Regardless whether Miller subjectively felt pressure to contribute to Weinstein's campaigns, Brown's alleged comments to Miller in 1986 have little probative value with respect to Weinstein's motives for discharging Miller in 2005.

The court acknowledges that there is a genuine factual dispute about whether Miller did, in fact, attend the fundraiser on August 5, 2004. At Miller's criminal trial, Weinstein testified that he had given Miller a complimentary ticket to attend the event, and that he recalled seeing her there. (Pl.'s Ex. 14 at 31.) Miller testified to the contrary. She stated that she had not received a complimentary ticket, and that she could not have attended the event because she was recovering from a back injury at the time. ( Miller Dep. 12.) While this dispute is genuine, it is not material. Miller's presence or absence on the day in question makes no dispositive difference. Brown's alleged comments in 1986, even when coupled with an alleged practice of inappropriate political solicitation within the confines of the Treasurer's Office during the

following eighteen years, cannot enable a reasonable jury to infer that Miller was discharged because she failed to purchase a $250.00 ticket for a campaign fundraiser in 2004.

The period of time between the fundraiser and Miller's discharge belies any notion that Miller was discharged in retaliation for her failure to purchase a ticket. A reasonable jury may infer that an employment action was motivated by a discriminatory or retaliatory animus where the timing of the action is "unusually suggestive" of discrimination or retaliation. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008). That standard is not met here. Weinstein's campaign fundraiser with Governor Rendell was held on August 5, 2004. Miller was not discharged until April 2005. Moreover, Weinstein's decision to discharge Miller immediately followed Miller's email of April 5, 2005. No reasonable jury could find that Miller's failure to buy a $250.00 ticket to the fundraiser was a substantial or motivating factor behind Weinstein's decision to terminate Miller. Weinstein and Allegheny County are entitled to summary judgment with respect to Miller's political patronage discrimination claims.

### *Conclusion*

The core facts surrounding Miller's termination are not subject to dispute. Miller sent Weinstein an email that, on its face, was a proposal to engage in illegal activity. While Miller may question whether she committed a criminal act, there is no question that her message did not enjoy First Amendment protection from employer discipline. The First Amendment was not designed to "constitutionalize the employee grievance." *Connick*, 461 U.S. at 154. Whatever may be said concerning the propriety of Weinstein's decision to discharge Miller, it is clear that Miller's discharge after she sent the April 5, 2005 email did not violate the Constitution.

For these reasons, in accordance with the recommendation of the magistrate judge, the motion for summary judgment filed by Weinstein and Allegheny County (Doc. No. 53) is **GRANTED**.

By the court:

<u>/s/ JOY FLOWERS CONTI</u>
Joy Flowers Conti
United States District Judge

Dated: September 12, 2008

cc:     Counsel of Record